IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

EUGENE DIVISION

| | |
|---|---|
| NEWPORT FISHERMEN'S WIVES, INC., an Oregon nonprofit corporation; LINCOLN COUNTY, | Civ. No. 6:25-cv-02165-AA |
| Plaintiffs, | **OPINION & ORDER** |
| v. | |
| UNITED STATES COAST GUARD, an agency of the United States Department of Homeland Security; KRISTI NOEM, in her official capacity as Secretary of the Department of Homeland Security, | |
| Defendants. | |

AIKEN, District Judge.

This case comes before the Court on a Motion for Temporary Restraining Order, ECF No. 8, filed by Plaintiffs Newport Fishermen's Wives, Inc. and Lincoln County. Plaintiffs seek to enjoin the effective closure of the Coast Guard's Newport Air Facility in Newport, Oregon. For the reasons set forth below, the motion is GRANTED.

## LEGAL STANDARD

"In deciding whether to grant a motion for a temporary restraining order ('TRO'), courts look to substantially the same factors that apply to a court's decision

on whether to issue a preliminary injunction. *Pacific Kidney & Hypertension LLC v. Kassakian*, 156 F. Supp.3d 1219, 1222 (D. Or. 2016). A preliminary injunction is an "extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008). A plaintiff seeking a preliminary injunction must show (1) that he or she is likely to succeed on the merits; (2) he or she is likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of the equities tips in his or her favor; and (4) an injunction is in the public interest. *Id.* at 20.

In the Ninth Circuit, courts may apply an alternative "serious questions" test which allows for a preliminary injunction where a plaintiff shows that "serious questions going to the merits" were raised and the balance of hardships tips sharply in plaintiff's favor, assuming the other two elements of the *Winter* test are met. *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131-32 (9th Cir. 2011). This formulation applies a sliding scale approach where a stronger showing on one element may offset a weaker showing in another element. *Id.* at 1131. Nevertheless, the party requesting a preliminary injunction must carry its burden of persuasion by a "clear showing" of the four elements set forth above. *Lopez v. Brewer*, 680 F.3d 1068, 1072 (9th Cir. 2012).

## DISCUSSION

Plaintiffs allege that Defendants United States Coast Guard and Secretary of the Department of Homeland Security Kristi Noem are unlawfully closing the Coast Guard's Newport Air Facility. Plaintiffs allege that the removal of the Newport Air

Facility's rescue capacity on the eve of Dungeness crab fishing season poses a grave risk to the fishermen in Newport and the surrounding communities. Plaintiffs seek an injunction:

> Requiring the U.S. Coast Guard and the Department of Homeland Security acting by and through Secretary Kristi Noem to immediately restore and maintain the status quo ante that has prevailed since 1987 by returning the rescue helicopter to the Coast Guard's Newport Air Facility, together with full operational capabilities, infrastructure and personnel support.

Pl. Mot. 2.

## I.    Background

The following facts are derived from the Complaint, ECF No. 1, and the Declarations submitted in support of the TRO motion.

Plaintiff Newport Fishermen's Wives, Inc. ("NFW") is a federally registered charity and Oregon non-profit corporation based in Lincoln County, Oregon. Compl. ¶ 4. NFW's mission is "for the purpose of voluntarily aiding and assisting families, relatives, or dependents of commercial fishermen or deceased commercial fishermen." *Id.* Many of NFW's members have family who work in the Newport fishing fleet, *see e.g.*, Bostwick-Terry Decl. ¶ 4, ECF No. 9, while other NFW members are direct participants in the Newport fishing industry, Ripka Decl ¶ 3, ECF No. 12,; Dixon Decl. ¶ 2, ECF No. 11. Plaintiff Lincoln County is a political subdivision of the State of Oregon with interests in the continued operation of the Newport Air Facility. Compl. ¶ 5; Chuck Decl., ECF No. 13.

The U.S. Coast Guard opened the Newport Air Facility in 1987 following the loss of the crew of the fishing vessel Lasseigne, which capsized in 1985. Compl. ¶ 14.

Following the loss of Lasseigne and her crew, the NFW "led the fight on behalf of the larger Newport community to secure a rapid response Coast Guard rescue helicopter for Oregon's central coast." *Id.* at ¶ 15. They were successful and, on July 3, 1986, federal legislation was signed appropriating funds for the construction of the Newport Air Facility. *Id.* A temporary facility was opened by the Coast Guard in 1987 and, in 1992, Congress approved funding for a permanent facility, which was formally dedicated in January 1994. *Id.* The Newport Air Facility has been in operation for nearly 40 years. *Id.* The Newport Air Facility's helicopter has conducted approximately 50 or more annual rescues in recent years. Cyr. Decl. ¶ 14(a), ECF No. 10; *see also* Compl. ¶ 20 (between 2014 and 2025, the Newport rescue helicopter "was responsible for the rescue of approximately 500 people, including 30 commercial fishermen whose lives were saved at sea.").

In the fall of 2025, Plaintiffs learned that the Coast Guard has "either entirely ceased or, at a minimum, dramatically reduced operations at Newport Air Facility and is in the process of permanently closing the facility and removing associated infrastructure." Compl. ¶ 21; Dixon Decl. ¶ 11. The rescue helicopter normally stationed at the Newport Air Facility has been moved 70 miles south to North Bend, "while infrastructure necessary to Coast Guard operations and rescue flight capabilities at the Newport Air Facility either have been or are being removed." Compl. ¶ 21.

Oregon coastal waters are cold year-round and "these cold-water temperatures create life-threatening conditions requiring immediate rescue response in the case of

a mayday event or person overboard." Dixon Decl. ¶ 5; Ripka Decl. ¶ 6; Cyr Decl. ¶ 4 ("I can state with scientific certainty that cold water immersion creates immediate, life-threatening conditions that require rapid emergency response," and "Oregon's coastal waters, which average 50-54°F year-round," present "the same survival challenges" as the waters in Alaska.).

The rescue helicopter stationed at the Newport Air Facility has a 15-to-30-minute response time in a crisis, which is "fundamental to the industry's improved safety record," while helicopters stationed further away at facilities in North Bend, would have a response time between 60 and 90 minutes. Cyr Decl. ¶¶ 7, 10. This delayed response would eliminate safety margins in a situation where "[e]very minute of delay exponentially decreases survival probability." *Id.* at ¶¶ 6-7. Safety planning, insurance coverage, crew confidence, and the economic viability of smaller vessels all rely on the long-standing presence of the Newport Air Facility's rescue helicopter. *Id.* at ¶ 12. "Furthermore, the Astoria and North Bend Coast Guard stations cannot provide adequate coverage when simultaneously responding to emergencies in their own primary service areas," with the result that Newport's fighting fleet would be practically deprived of helicopter coverage without the Newport Air Facility. Compl. ¶ 26.

In addition to the risk to the lives of the fishermen and other members of the Newport community, the removal of the rescue helicopter will also "cause substantial economic impact including the loss of [ ] millions of dollars due to preventable search and rescue costs, vessel losses, and human casualties." Cyr Decl. ¶ 15; *see also* Chuck

Decl. ¶¶ 5-6 ("The commercial, aesthetic, recreational, scientific, environmental, educational, and even spiritual interests Lincoln County and/or its constituents will be adversely affected if the Coast Guard removes the helicopter," as "the loss of Newport Air Base will place additional strain on the County's first responders," and the "resulting decreased safety along our coast will also no doubt impact commercial fishing, recreation, and tourism revenue that are vital to Lincoln County's economy.").

Newport has a commercial fishing fleet of more than 250 vessels, which operate "in some of the most challenging maritime conditions on the West Coast." Cyr Decl. ¶ 9. "The Dungeness crab fishery is the single largest sector of Newport's fisheries income, supporting approximately 7,400 family wage jobs contributing directly and indirectly approximately $346 million annually to the economy." Compl. ¶ 9. The fishing season for Dungeness crab is imminent and typically runs from December to March. Dixon Decl. ¶ 9. Dungeness crab season is both the most lucrative and the most dangerous season of the year for Newport's fishermen. *Id.* at ¶ 8. The Dungeness crab fishery "has historically recorded fatality rates of 463 deaths per 100,000 workers—higher than even Alaska' notorious Bering Sea crab fishery." Cyr. Decl. ¶ 9. Between 2000 and 2019, 44 commercial fishermen perished in the waters off Oregon, including 12 off the coast of Newport. Compl. ¶ 12.

"During crab season, sea conditions are at their most dangerous," with "[l]arge swells and high winds," and "[i]f the rescue helicopter has to fly [to Newport] from North Bend or Astoria, there is no question that emergency response time will be significantly increased, putting lives at risk." Ripka Decl. ¶ 9.

No public meetings were held in Newport regarding changes to helicopter operations and there was no public notice or opportunity for comment. Ripka Decl. ¶ 10; Dixon Decl. ¶ 11; Bostwick-Terry Decl. ¶ 10. Plaintiffs also allege that no findings were made by the Secretary of the Department of Homeland Security concerning the closure of the Newport Air Facility, nor was any notice provided to Congress. Compl. ¶ 22.

## II.     Success on the Merits

To prevail on a motion for preliminary injunction, a plaintiff must show either a likelihood of eventual success on the merits or, under the Ninth Circuit's alternative "sliding scale" formulation of the test, serious questions going to the merits of their claims. *Winter*, 555 U.S. at 20; *Alliance for the Wild Rockies*, 632 F.3d at 1131-32. However, a court's decision on a motion for preliminary injunction or TRO is not a ruling on the merits of the claim. *Sierra On-Line, Inc. v. Phoenix Software, Inc.*, 739 F.2d 1415, 1422 (9th Cir. 1984).

Here, Plaintiffs allege that Defendants' effective closure of the Newport Air Facility violates 14 U.S.C. § 912 and the Administrative Procedures Act ("APA"), 5 U.S.C. § 706.

There was previous litigation, *Newport Fishermen's Wives et al. v. United States Coast Guard*, 6:14-cv-01890-MC, concerning an attempt to close the Newport Air Facility in 2014, which was forestalled by an Act of Congress which ensured that the Newport Air Facility would remain open through 2016. Congress subsequently enacted 14 U.S.C. § 912, which provides that the Secretary of Homeland Security

"may not close a Coast Guard air facility except as specified by this section." 19 U.S.C. § 912(a)(1).

The Secretary "may not propose closing or terminating operations at a Coast Guard air facility," unless she determines that (1) "remaining search and rescue capabilities maintain the safety of the maritime public in the area of the air facility;" (2) "regional or local prevailing weather and marine conditions, including water temperatures or unusual tide and current conditions, do not require continued operation of the air facility;" and (3) Coast Guard search and rescue standards related to search and response times are met. 14 U.S.C. § 912(a)(2). Here, Plaintiffs have alleged that no such determinations have been made by Secretary Noem prior to terminating operations at the Newport Air Facility and that, even if they had been made, no such determinations would be legally or factually defensible.

In addition to making the necessary determinations, the Secretary must provide opportunities for public comment, "including the convening of public meetings in communities in the area of responsibility of the air facility with regard to the proposed closure or cessation of operations of the air facility," 14 U.S.C. § 912(a)(3)(A), and they must notify the congressional offices of the representatives of the area of responsibility of the schedule and location of such public meetings. 14 U.S.C. § 912(a)(3)(B). Plaintiffs have presented evidence, in the form of Declarations by members of NFW's leadership, that no such public meetings have taken place.

Section 912 also contains strict requirements concerning notification to Congress:

Prior to closure, cessation of operations, or any significant reduction in personnel and use of a Coast Guard air facility that is in operation on or after December 31, 2017, the Secretary shall—

> (A) submit to the Congress a proposal for such closure, cessation, or reduction in operations along with the budget of the President submitted to Congress under section 1105(a) of title 31 that includes--

>> (i) a discussion of the determination made by the Secretary pursuant to paragraph (2); and

>> (ii) a report summarizing the public comments received by the Secretary under paragraph (3)

> (B) not later than 7 days after the date a proposal for an air facility is submitted pursuant to subparagraph (A), provide written notice of such proposal to each of the following:

>> (i) Each member of the House of Representatives who represents a district in which the air facility is located.

>> (ii) Each member of the Senate who represents a State in which the air facility is located.

>> (iii) Each member of the House of Representatives who represents a district in which assets of the air facility conduct search and rescue operations.

>> (iv) Each member of the Senate who represents a State in which assets of the air facility conduct search and rescue operations.

>> (v) The Committee on Appropriations of the House of Representatives.

>> (vi) The Committee on Transportation and Infrastructure of the House of Representatives.

>> (vii) The Committee on Appropriations of the Senate.

>> (viii) The Committee on Commerce, Science, and Transportation of the Senate.

14 U.S.C. § 912(a)(4).

Furthermore, the Secretary "may not close, cease operations, or significantly reduce personnel and use of a Coast Guard air facility for which a written notice is provided under paragraph (4)(A) until a period of 18 months beginning on the date on which such notice is provided has elapsed." 14 U.S.C. § 912(a)(5).

Here, Plaintiffs have alleged that, in addition to there having been no public notice and comment as required by § 912(a)(3), there has been no Congressional notification as required by § 912(a)(4), and so the eighteen-month time limit established by § 912(a)(5) has not even begun to run.

As Plaintiffs acknowledge, some operational flexibility is afforded to the Secretary under § 912(b)[1], but that operation flexibility does not, by the plain terms of § 912(a), extend to decisions which close, cease operations, or significantly reduce personnel and use of a Coast Guard air facility.

Plaintiffs allege that, in light of the requirements of 14 U.S.C. § 912, Defendants' decision to close the Newport Air Facility is arbitrary and capricious, and not in accordance with law for purposes of 5 U.S.C. § 706(A). Plaintiffs also allege that, by failing to comply with the requirements of § 912, Defendants have acted in excess of statutory jurisdiction, authority or limitations, and statutory rights, that the decision to close the air facility was done "without observance of procedure required by law." 5 U.S.C. §§ 706(2)(C), (D).

---

[1] "The Secretary may implement any reasonable management efficiencies within the air station and air facility network, such as modifying operational posture of units or reallocating resources necessary to ensure the safety of the maritime public nationwide." 14 U.S.C. § 912(b).

On this record, the Court concludes that Plaintiffs have made a compelling showing of likely success on the merits or, at the very least, serious questions going to the merits of their APA claims concerning the closure of the Newport Air Facility. The Court concludes that this factor weighs in favor of Plaintiffs' requested injunction.

### III.    Irreparable Harm

A plaintiff seeking an injunction must "must establish that irreparable harm is *likely*, not just possible." *Alliance for the Wild Rockies*, 632 F.3d at 1131 (emphasis in original). Here, Plaintiffs have presented compelling evidence of a grave risk to the lives of the Newport fishermen in the coming Dungeness crab fishing season, as well as risks to the other members of the community which rely on the Newport Air Facility for helicopter rescue. The Court concludes that this factor weighs in favor of the requested injunction. Furthermore, the Court concludes that the danger presented by the lack of rescue helicopter coverage justifies issuance of a TRO on an expedited basis.

### IV.    Balance of the Equities and the Public Interest

Under the "balance of equities" analysis, a court must "balance the competing claims of injury" and "consider the effect on each party of the granting or withholding of the requested relief." *Winter*, 555 U.S. at 24 (internal quotation marks and citation omitted). The public interest inquiry, by contrast, "primarily addresses impact on non-parties rather than parties." *League of Wilderness Defs./Blue Mountains Biodiversity Project v. Connaughton*, 752 F.3d 755, 766 (9th Cir. 2014). When, as

here, the government is a party to the action, these factors will merge. *Drakes Bay Oyster Co. v. Jewell*, 747 F.3d 1073, 1092 (9th Cir. 2014).

Here, Plaintiffs have made a compelling showing that public safety, and by extension the public interest, are deeply intertwined with the continued operation of the Newport Air Facility, particularly as the fishermen prepare for the most dangerous season of the year. The Newport Air Facility was constructed in response to a maritime tragedy and Plaintiffs have presented evidence that, without its continued operation, the Newport fishermen and the community at large will face serious danger due to the lack of rescue helicopter coverage.

The Court has not been presented, as yet, with an argument for Defendants' countervailing interests in removing the Newport Air Facility, but the Court notes that Congress expressed, in no uncertain terms, that the Secretary must make certain determinations and follow notice and comment procedures for the public and provide notification to Congress before closing or even significantly reducing the use of a Coast Guard air facility. The evidence before the Court at this juncture is that those procedures were not followed and the Court can discern no hardship to Defendants in an injunction requiring them to continue operating the Newport Air Facility as they have for the better part of four decades.

The Court concludes that the balance of the equities and the public interest weigh sharply in favor of the requested injunction.

V.     **Bond**

The Court "may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c). Here, the Court concludes that the facts of this case do not support the necessity of a bond at this time. The Court may revisit the question of a bond, should a preliminary injunction be necessary in this case.

**CONCLUSION**

For the reasons set forth above, Plaintiffs' Motion for Temporary Restraining Order, ECF No. 8 is GRANTED.  The Court hereby issues an injunction ORDERING the U.S. Coast Guard and the Department of Homeland Security acting by and through Secretary Kristi Noem to immediately restore and maintain the status quo ante that has prevailed since 1987 by returning the rescue helicopter to the Coast Guard's Newport Air Facility, together with full operational capabilities, infrastructure and personnel support.

This injunction shall continue in force and effect for fourteen (14) days from the date and time of this Order.  Plaintiffs are ORDERED to promptly serve this Order on Defendants.  Following service, the parties are ORDERED to confer on a date and time for a preliminary injunction hearing and on a briefing schedule on the question of a continuing injunction.  Any questions regarding scheduling should be directed to the Courtroom Deputy.

It is so ORDERED and DATED this ____24th____ day of    November    2025    at __6:37__ p.m..

 /s/Ann Aiken_____
ANN AIKEN
United States District Judge