IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

EUGENE DIVISION

NEWPORT FISHERMEN'S
WIVES, INC., an Oregon nonprofit
corporation; LINCOLN COUNTY,

                    Plaintiffs,

     v.

UNITED STATES COAST GUARD,
an agency of the United States
Department of Homeland Security;
KRISTI NOEM, in her official capacity
as Secretary of the Department of
Homeland Security,

                Defendants,

    and

CITY OF NEWPORT,

                Amicus.

_____

Civ. No. 6:25-cv-02165-AA (Leading case)
Civ. No. 6:25-cv-02172-AA (Trailing case)

**OPINION & ORDER**

AIKEN, District Judge.

      This case comes before the Court Motions for Preliminary Injunction filed by Plaintiffs Newport Fishermen's Wives and Lincoln County, ECF No. 39, and by Plaintiff State of Oregon, ECF No. 42. The Court has also received an amicus brief in support of the proposed injunction filed by the City of Newport, along with supporting Declarations. ECF Nos. 30, 31, 32. The Court held an evidentiary hearing

on the motions on December 8, 2025. ECF No. 55. For the reasons set forth below, the motions are GRANTED.

## LEGAL STANDARD

A preliminary injunction is an "extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008). A plaintiff seeking a preliminary injunction must show (1) that he or she is likely to succeed on the merits; (2) he or she is likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of the equities tips in his or her favor; and (4) an injunction is in the public interest. *Id.* at 20.

In the Ninth Circuit, courts may apply an alternative "serious questions" test which allows for a preliminary injunction where a plaintiff shows that "serious questions going to the merits" were raised and the balance of hardships tips sharply in plaintiff's favor, assuming the other two elements of the *Winter* test are met. *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131-32 (9th Cir. 2011). This formulation applies a sliding scale approach where a stronger showing on one element may offset a weaker showing in another element. *Id.* at 1131. Nevertheless, the party requesting a preliminary injunction must carry its burden of persuasion by a "clear showing" of the four elements set forth above. *Lopez v. Brewer*, 680 F.3d 1068, 1072 (9th Cir. 2012).

# BACKGROUND

## I.    Factual Background

### A. The Parties

Plaintiff Newport Fishermen's Wives, Inc. ("NFW") is a federally registered charity and Oregon non-profit corporation based in Lincoln County, Oregon. NFW Compl. ¶ 4. ECF No. 1. NFW's mission is "voluntarily aiding and assisting families, relatives, or dependents of commercial fishermen or deceased commercial fishermen." *Id.* Many of NFW's members have family who work in the Newport fishing fleet, *see e.g.*, Bostwick-Terry Decl. ¶ 4, ECF No. 9, while other NFW members are direct participants in the Newport fishing industry. Dixon Decl. ¶ 2, ECF No. 11.

Employees of Plaintiff State of Oregon also operate as mariners in the Newport area. The Oregon Department of Fish and Wildlife ("ODFW") routinely conducts field research on the sea in and around Newport which "informs resource management and policy decisions, including establishing sustainable fishing regulations, preserving nearshore ecosystems, and understanding potential impacts of coastal and offshore development projects like the placement of undersea cables and offshore wind energy." Ainsworth Decl. ¶ 3. ECF No. 11 in 6:25-cv-02172-AA. ODFW researchers are frequently aboard small and large vessels, "commonly with 200 cumulative annual trips on ocean or estuary waters," and "conduct field research year-round, including in the winter months when maritime conditions are often treacherous." Ainsworth Decl. ¶¶ 4-5.

Similarly, the Oregon State Police ("OSP") maintains its only long-range ocean-going patrol vessel, the Guardian, in Newport, along with OSP's smaller vessels, and OSP relies on the Coast Guard for rescue in emergency situations. Thomas Decl. ¶¶ 3-5.  ECF No. 10 in 6:25-cv-02172-AA.

Plaintiff Lincoln County is a political subdivision of the State of Oregon and home to the City of Newport.  Ocean and coastal natural resources play an "important role" in the lives and livelihoods of the residents of Lincoln County. Chuck Decl. ¶ 4.  ECF No. 13.

Defendant United States Coast Guard is an agency of the United States Department of Homeland Security and Defendant Kristi Noem is the Secretary of the Department of Homeland Security.  NFW Compl. ¶¶ 6-7.

**B. Oregon Coastal Waters and the Dungeness Crab Fishery**

Oregon coastal waters are cold year-round and "these cold-water temperatures create life-threatening conditions requiring immediate rescue response in the case of a mayday event or person overboard."  Dixon Decl. ¶ 5; Ripka Decl. ¶ 6, ECF No. 12; Cyr Decl. ¶ 4, ECF No. 10 ("I can state with scientific certainty that cold water immersion creates immediate, life-threatening conditions that require rapid emergency response," and "Oregon's coastal waters, which average 50-54°F year-round," present "the same survival challenges" as the waters in Alaska.).

Newport has a commercial fishing fleet of more than 250 vessels, which operate "in some of the most challenging maritime conditions on the West Coast."  Cyr Decl. ¶ 9.  "The Dungeness crab fishery is the single largest sector of Newport's fisheries

income, supporting approximately 7,400 family wage jobs contributing directly and indirectly approximately $346 million annually to the economy." NFW Compl. ¶ 9. The fishing season for Dungeness crab has now begun and it typically runs from December to March. Dixon Decl. ¶ 9. Dungeness crab season is both the most lucrative and the most dangerous season of the year for Newport's fishermen. *Id.* at ¶ 8. The Dungeness crab fishery "has historically recorded fatality rates of 463 deaths per 100,000 workers—higher than even Alaska's notorious Bering Sea crab fishery." Cyr. Decl. ¶ 9. Between 2000 and 2019, 44 commercial fishermen perished in the waters off Oregon, including 12 off the coast of Newport. NFW Compl. ¶ 12.

"During crab season, sea conditions are at their most dangerous," with "[l]arge swells and high winds." Ripka Decl. ¶ 9. The perils of the Dungeness crab fishery were underscored by the loss of a Newport-based crab fishing vessel, F/V Valor III, only a few days after the evidentiary hearing in this case. Garret Jaros, *Two Newport Crabbers Saved Sunday When Boat Sinks While Dumping First Pots of Season*, LINCOLN CHRONICLE, Dec. 15, 2025, https://lincolnchronicle.org/two-newport-crabbers-saved-sunday-when-boat-sinks-while-dumping-first-pots-of-season/ (last accessed December 21, 2025). The crew of F/V Valor III were quickly rescued by the Coast Guard. *Id.*

## C. The History of AIRFAC Newport and the Enactment of 14 U.S.C. § 912

In 1985, the Newport-based fishing vessel Lasseigne capsized twenty miles off the Oregon coast. NFW Compl. ¶ 14; Reinhold Decl. ¶ 21, ECF No. 46. Coast Guard

helicopters were quickly launched from Astoria and North Bend and arrived one hour and fourteen minutes after receiving Lasseigne's distress call. NFW Compl. ¶ 14. When they arrived, the Coast Guard found two of Lasseigne's three crewmen had already perished. *Id.* The third crewman was taken to a hospital in Lincoln City where he died of hypothermia. *Id.*

After the Lasseigne disaster, the NFW "led the fight on behalf of the larger Newport community to secure a rapid response Coast Guard rescue helicopter for Oregon's central coast." NFW Compl. ¶ 15. They were successful and, on July 3, 1986, federal legislation was signed appropriating funds for the construction of the Newport Air Facility ("AIRFAC Newport"). *Id.* A temporary facility was opened by the Coast Guard in 1987 and, in 1992, Congress approved funding for a permanent facility, which was formally dedicated in January 1994. *Id.* AIRFAC Newport has been in operation for nearly four decades. *Id.*

In 2012, the Coast Guard concluded that the search and rescue ("SAR") coverage provided by AIRFAC Newport was redundant to the coverage provided by Air Station ("AIRSTA") North Bend and AIRSTA Astoria and, in 2014, the Coast Guard attempted to close the AIRFAC Newport, as well as another Air Facility in Charleston, South Carolina. Reinhold Decl. ¶¶ 22-23. NFW, the City of Newport, Lincoln County, and the Port of Newport sued to prevent the closure. *Newport Fishermen's Wives et al. v. United States Coast Guard*, 6:14-cv-01890-MC, 2015 WL 1951751 (D. Or. April 29, 2015). However, the litigation was mooted by the

enactment of the Howard Coble Coast Guard and Maritime Transportation Act of 2014, which prohibited closure of AIRFAC Newport until January 1, 2016. *Id.* at *1.

Congress subsequently enacted 14 U.S.C. § 912, which provides that the Secretary of Homeland Security "may not close a Coast Guard air facility except as specified by this section." 19 U.S.C. § 912(a)(1). The requirements of § 912(a) will be discussed in greater detail below but it requires, among other things, notice and public comment, public meetings in the affected communities, notification to Congress, and a waiting period of eighteen months after notification to Congress before closing, ceasing operations, or significantly reducing the personnel and use of a Coast Guard air facility.

In February 2016, Oregon Congressman Peter DeFazio addressed the U.S. House of Representatives about the purpose of the legislation:

> [T]his legislation authorizes a rigorous administrative process that the Coast Guard must follow before it can close any AIRFAC.
>
> In the future, the Coast Guard must promptly notify Members of Congress representing affected areas and convene public meetings in communities within the area of responsibility of the AIRFAC to gather information on how the closure would affect residents and visitors.
>
> In its totality, this provision will ensure that any future proposal to close an AIRFAC will be vetted extensively through a transparent public process; a process that will ensure that the Coast Guard's search and rescue capabilities are the absolute last place anyone should consider cutting the Coast Guard's budget.

Brickenstein Decl. Ex. A, at 3. ECF No. 43.

### D. Operation of the AIRFAC Newport

AIRFAC Newport is located 95 nautical miles south of AIRSTA Astoria and 70 miles north of AIRSTA North Bend.  Reinhold Decl. ¶ 5.  AIRSTA Astoria and AIRSTA North Bend are "far larger" than AIRFAC Newport and each Air Station "houses multiple helicopters along with dozens of support personnel." *Id.*

AIRFAC Newport serves as "a forward operating location of AIRSTA North Bend" for "a single Coast Guard helicopter to operate primarily in Search and Rescue ("SAR") efforts near the Oregon coastline."  Reinhold Decl. ¶¶ 4, 6.  AIRFAC Newport is equipped with "a hangar, a fuel farm, and also berthing, kitchen, and gym equipment for the aircrew."  Olson Decl. Ex. 1, at 13, ECF No. 44.  Since 2018, one aviation rated petty officer, the Station Keeper, is permanently assigned to AIRFAC Newport to maintain the fuel farm and assist the aircrew.  Reinhold Decl. ¶ 6.

A Coast Guard MH-65 helicopter will be deployed from AIRSTA North Bend to AIRFAC Newport and, while deployed to AIRFAC Newport, the helicopter crew remains at a readiness status for the entire time they are at AIRFAC Newport. Reinhold Decl. ¶ 7.

Coast Guard helicopters and aircrews maintain different levels of readiness status.  Relevant to the present case are "B-0 status," in which "the crew is on standby to launch within thirty minutes of notification of a distress situation" and "B-1 status," in which "the crew is on standby to launch within one hour of notification of a distress situation."  Reinhold Decl. ¶ 8.  For safety reasons, an aircrew can remain

at B-0 status for 24 hours, while B-1 status "can be maintained safely by a single crew for multiple days in a row." *Id.*

When the helicopter and aircrew assigned to AIRFAC Newport was maintained at B-0 readiness status, it would remain at AIRFAC Newport for 24 hours, after which it would return to AIRSTA North Bend and be replaced at AIRFAC Newport by another helicopter and aircrew. Reinhold Decl. ¶ 9. When AIRFAC Newport is maintained at B-1 readiness status, the assigned helicopter and aircrew will remain at AIRFAC Newport for multiple days before returning to AIRSTA North Bend and being replaced by another helicopter and aircrew. *Id.* AIRSTA North Bend maintains a helicopter at B-0 status. Olson Decl. Ex. 1, at 15.

Prior to 2019, the Coast Guard maintained a rescue helicopter at AIRFAC Newport in B-0 status. Reinhold Decl. ¶ 25. On August 21, 2019, the Coast Guard changed the readiness status of the helicopter assigned to AIRFAC Newport to B-1 to reduce the number of flight hours spent in transit between AIRFAC Newport and AIRSTA North Bend. *Id.* Whether in B-0 or B-1 status, a helicopter was deployed to AIRFAC Newport every day. *Id.* at ¶ 26.

Captain Reinhold testified that, although a helicopter in B-1 status must launch within one hour, they generally launch "well before" that deadline and the launch of the B-1 status helicopter at AIRFAC Newport "would probably be close to the 30-minute window," rather than the one-hour requirement. Olson Decl. Ex. 3, at 18.[1] Helicopters at B-0 status will launch "close to the 30 minutes almost all the

---

[1] Captain Reinhold testified that launching faster than requirements is "what we do . . . We join the Coast Guard. We're a humanitarian service. We do search and rescue. It's our sacred trust with the

time," but "more often than not, you're bumping up against that 30-minute window in Bravo Zero status." *Id.* at 18-19.

Beginning on April 24, 2021, through September 9, 2021, the Coast Guard began deploying a rescue helicopter to AIRFAC Newport only on the weekends. Reinhold Decl. ¶ 26. In 2023, the Coast Guard once again deployed the rescue helicopter to AIRFAC Newport only on the weekends between June 1, 2022, and October 2, 2022. *Id.* In 2023 and 2024, AIRSTA North Bend deployed a helicopter to AIRFAC Newport on weekends and holidays from May through September. *Id.* at ¶ 28. "The remainder of the year AIRFAC Newport was operational every day with occasional exceptions because of weather issues, maintenance or repair of helicopters, crew availability, or deployments." *Id.*

"The flight time for an MH-65 from AIRSTA North Bend to Newport is 34 minutes at 120 knots." Olson Decl. Ex. 1, at 11-12. Captain Reinhold testified that winter weather conditions on the Oregon coast are "not ideal" and that weather conditions can entirely prevent the launch of a rescue helicopter and at other times "they will have to pick their way through the weather or move at a slower pace." Brickenstein Decl. Ex. B, at 5-6.

---

public. We want to get out there and help . . . We want to serve the public." Olson Decl. Ex. 3, at 18. The Court wishes to commend Captain Reinhold and thank him and the men and women of the U.S. Coast Guard for their service to the people of the United States.

### E. The Coast Guard Ceases Assigning a Helicopter to AIRFAC Newport and the Commencement of this Action

"AIRFAC Newport began 2025 in a B-1 readiness status." Reinhold Decl. ¶ 29. On April 8, 2025, Captain Jason Bustamente wrote a memo (the "April 8 Memo") requesting permission for AIRSTA North Bend to discontinue staffing AIRFAC Newport with a B-1 status aircrew "between 05 May and 30 September 2025." Olson Decl. Ex. 4, at 1. The April 8 Memo indicated AIRSTA North Bend was struggling with staffing issues and that "since February 2025, ASNB [AIRSTA North Bend] has sent four pilots, including one AC [H65 Aircraft Commander] to support Alien Expulsion Operations along the Southern Border, totaling eight weeks[.]" *Id.*

Beginning on May 5, 2025, the Coast Guard ceased deploying a rescue helicopter to AIRFAC Newport. Reinhold Decl. ¶ 29. Helicopters from AIRSTA North Bend would periodically use AIRFAC Newport to train with the crews at Coast Guard Stations Yaquina Bay and Depoe Bay and helicopter crews "in a non-readiness status" would occasionally remain overnight at AIRFAC Newport "to increase mission execution efficiencies and training opportunities." Reinhold Decl. ¶ 29. Between March 1, 2025, and November 15, 2025, Coast Guard helicopters from AIRSTA North Bend used AIRFAC Newport "for periods of time ranging from less than an hour to approximately 48 hours." Olson Decl. Ex. 2, at 3. Captain Reinhold testified that this was the first time since 1987 that there was no continuous rescue helicopter presence at AIRFAC Newport outside of the summer months. Supp. Brickenstein Decl. Ex. B, at 9-10, ECF No. 53.

On May 22, 2025, Captain Brian Conley wrote a memo (the "May 22 Memo") endorsing Captain Bustamente's proposal in the April 8 Memo. Olson Decl. Ex. 4, at 2. Captain Conley wrote that it was "essential to develop a clear plan for the reinstatement of B-1 aircrew staffing at Newport as soon as resource availability allows," and that "[b]y carefully managing risks and actively seeking opportunities to maximize training and operational effectiveness, [AIRSTA North Bend] can minimize the impact of this temporary change and maintain its overall readiness posture." *Id.*

On June 29, 2025, Admiral Charles Fosse wrote a memo (the "June 29 Memo") in response to the April 8 Memo and the May 22 Memo. Olson Decl. Ex. 4, at 3. Admiral Fosse approved the request to stop deploying a helicopter to AIRFAC Newport "with some caveats." *Id.* Admiral Fosse directed AIRSTA North Bend to work to "mitigate risks to public safety" and "maximize opportunities to maintain a presence at Air Facility Newport through weekly training events with Stations Yaquina Bay and Depoe Bay, including night training events with overnight stays at the Air Facility whenever possible." *Id.* Admiral Fosse ordered that crews "that remain overnight [at AIRFAC Newport] should be in B-1 status, ready to respond when requested." *Id.* Admiral Fosse expressed his expectation that AIRSTA North Bend "will resume standing the watch [at AIRFAC Newport] as soon as staffing allows, with a minimum goal of staffing AIRFAC Newport as we have over the last several summer seasons" to "reduce the risk to the public during the summer when we see higher levels of recreational boating." *Id.*

On October 29, 2025, Scott Giard[2] issued a memo (the "October 29 Memo"). Olson Decl. Ex. 1, at 4. In the October 29 Memo, Mr. Giard stated that the "staffing issues" that had resulted in the cessation of helicopter deployments to AIRFAC Newport had been "overcome." *Id.* However, "mission critical deployments of aviation personnel preclude the reconstitution of a B-1 readiness at Air Facility Newport" and "CGD Northwest expects to continue sourcing much of the aviation personnel deployment needs with [AIRSTA North Bend] personnel." *Id.* Mr. Giard "assess[ed] that an acceptable amount of risk remains and continues to be proactively managed." *Id.* The October 29 Memo stated that AIRSTA North Bend's "request to continue the medication" (*i.e.*, the discontinuation of rescue helicopter deployment to AIRFAC Newport) "until sufficient aviation personnel are available" had been granted. *Id.* In sum, there would be no rescue helicopter deployed to AIRFAC Newport with no stated timeline for its return. *Id.*

Between October and November 2025, the Coast Guard removed signage from AIRFAC Newport designating it as a Coast Guard facility. Supp. Brickenstein Decl. Ex. B, at 11-12. At his deposition, Captain Reinhold testified that the signage had been removed because the Coast Guard "had no current rotational presence there," and because "the facility wasn't being used overnight like it had in the past." *Id.* at 12. Captain Reinhold testified that the signage has since been returned by order of the Coast Guard Commandant. *Id.* The Government also admits that "certain aviation ground support equipment" was removed from AIRFAC Newport but affirms

---

[2] No rank is given for Scott Giard in the Coast Guard memoranda, and he is referred to as "Mr. Scott Giard" by Admiral Fosse in the June 29 Memo. Olson Decl. Ex. 4, at 3.

that, like the signage, "equipment necessary to support the forward deployed helicopter at AIRFAC Newport has been returned." Olson Decl. Ex. 2, at 3.

In the fall of 2025, NFW learned that the Coast Guard had ceased operations or "at minimum, dramatically reduced operations" at AIRFAC Newport and had begun removing equipment from the facility. NFW Compl. ¶ 21; Dixon Decl. ¶ 11.

In November 2025, one of the helicopters from AIRSTA North Bend was redeployed to AIRSTA San Diego. Reinhold Decl. ¶ 10. In response to interrogatories, the Government stated that "[w]hile deployed to Sector San Diego, the AIRSTA North Bend MH-65E was flying missions along the border, looking for anyone attempting to cross the border illegally," and "was also positioned to respond to SAR." Olson Decl. Ex. 1, at 15. The deployment of a helicopter from AIRSTA North Bend to AIRSTA San Diego "prevented AIRSTA North Bend from resuming a B-1 readiness status at AIRFAC Newport." Reinhold Decl. ¶ 30. Captain Reinhold testified that the intention, expressed to him by the chief of aviation forces in the Pacific area on October 20, 2025, was to return the helicopter that had been sent to San Diego to AIRSTA North Bend by mid-December 2025. Olson Decl. Ex. 3, at 34-35. However, on October 20, 2025, the Dungeness crab season was projected to commence on December 1, 2025. *Id.* at 35.

On November 23, 2025, a Coast Guard representative attended a meeting in Newport with Oregon Senator Ron Wyden and representatives of NFW, the State of Oregon, Lincoln County, the City of Newport, and the Confederated Tribes of Siletz Indians to discuss the reassignment of the Coast Guard rescue helicopter from

AIRFAC Newport. McMahon Decl. ¶¶ 4, 8. ECF No. 12 in 6:25-cv-02172-AA. During that meeting the Coast Guard's representative "confirmed that the U.S. Coast Guard had relocated the helicopter to North Bend indefinitely due to staffing shortages, and that in the Coast Guard's assessment, the Coast Guard was capable of meeting the 2 hour search and response time through the positioning of aircraft in North Bend and Astoria." *Id.* at ¶ 5. The Coast Guard representative "stated that the aviation facility would continue to remain in operational order despite the helicopter's absence," but was "unable to provide any information regarding when the helicopter would be returned to Newport," nor did he make a commitment to "rotate additional Coast Guard personnel to Newport to ensure adequate staffing throughout the crabbing season while the Coast Guard seeks a permanent staffing solution to support the return of the helicopter to Newport." *Id.* at ¶¶ 6-7.

As will be discussed in the following section, NFW and Lincoln County filed suit on November 21, 2025, and filed a Motion for Temporary Restraining Order ("TRO"), which the Court granted on November 24, 2025. Following the entry of the TRO, the Coast Guard returned the helicopter from AIRSTA San Diego to AIRSTA North Bend and "[t]he Coast Guard currently is rotating helicopters and air crews through AIRFAC Newport to maintain a B-1 status." Reinhold Decl. ¶¶ 11, 31; Olson Decl. Ex. 1, at 15.

In response to interrogatories, the Coast Guard has provided figures for the number of SAR mission launches and the number of lives saved from both AIRSTA North Bend and AIRFAC Newport between 2015 and 2025. Olson Decl. Ex. 1, at 7,

9. These figures show that both SAR mission launches and lives saved by AIRFAC Newport reached their nadir in 2025, with only 4 SAR mission launches and, for the only time in the data provided, no lives saved in 2025. *Id.*[3] The figures do not show any corresponding increase in SAR mission launches or lives saved from AIRSTA North Bend. *Id.* The number of SAR cases conducted by AIRFAC Newport in conjunction with local first responders ("agency assist cases") also declined from an average of 3.5 per year between 2015 and 2023 to a single SAR agency assist case in 2024 and no SAR agency assist cases in 2025. *Id.* at 10.

Defendants admit that they did not follow any of the procedures outlined in 14 U.S.C. § 912(a) prior to indefinitely reassigning the rescue helicopter from AIRFAC Newport. Olson Decl. Ex. 2, at 4-7.

## II.    Procedural Background

This case was originally filed on Friday, November 21, 2025, by NFW and Lincoln County, along with a Motion for Temporary Restraining Order. ECF Nos. 1, 8. The companion case, *State of Oregon v. Noem et al.*, 6:25-cv-02172-AA, was filed on Monday, November 24, 2025, and a TRO was sought in that case as well. *State of Oregon v. Noem* was originally assigned to Judge Amy Potter and the TRO motion was referred to Judge Michael McShane.

On Monday, November 24, 2025, the Court issued a TRO in this case ordering

> [T]he U.S. Coast Guard and the Department of Homeland Security acting by and through Secretary Kristi Noem to immediately restore

---

[3] The high point for both figures was in 2016, when 67 SAR missions were launched from AIRFAC Newport, resulting the saving of 16 lives. Olson Decl. Ex. 1, at 7, 9.

and maintain the status quo ante that has prevailed since 1987 by
returning the rescue helicopter to the Coast Guard's Newport Air
Facility, together with full operational capabilities, infrastructure and
personnel support.

Opinion and Order ("TRO Order"), at 14.  ECF No. 15.

On November 25, 2025, *State of Oregon v. Noem* was transferred to this

Court and the two cases were consolidated with Case No. 6:25-cv-01265-AA as the

lead case.  ECF No. 16.  Unless otherwise noted, all citations to the docket shall be

from the docket of the lead case.

On November 25, 2025, the City of Newport filed a Motion to Appear as

Amicus Curiae, ECF No. 29, which the Court granted.  ECF No. 35.

The present Motions for Preliminary Injunction were filed on December 4,

2025.  ECF Nos. 39, 42.  The Government filed its Response brief on December 5,

2025, and Plaintiffs filed their Reply briefs on December 8, 2025.  ECF Nos. 45, 49,

51.

The Court held a hearing on the motions on December 8, 2025, at which it

found good cause to extend the TRO for a further two weeks to allow for

consideration of the Motions for Preliminary Injunction.  ECF No. 55.

## DISCUSSION

Plaintiffs allege that Defendants United States Coast Guard and Secretary of

the Department of Homeland Security Kristi Noem are unlawfully closing, ceasing

operations at, and/or significantly reducing the personnel and use of AIRFAC

Newport without following the procedures outlined in statute.  Plaintiffs allege that

the removal of the Newport Air Facility's rescue capacity on the eve of Dungeness

crab fishing season poses a grave risk to the fishermen and other mariners, including ODFW and OSP employees, in Newport and the surrounding communities.

Plaintiffs assert that the rescue helicopter assigned to AIRFAC Newport has a 15-to-30-minute response time in a crisis, which is "fundamental to the industry's improved safety record," while helicopters at AIRSTA North Bend would have a response time between 60 and 90 minutes. Cyr Decl. ¶¶ 7, 10. This delayed response would eliminate safety margins in a situation where "[e]very minute of delay exponentially decreases survival probability." *Id.* at ¶¶ 6-7. Safety planning, insurance coverage, crew confidence, and the economic viability of smaller vessels all rely on the long-standing presence of the AIRFAC Newport's rescue helicopter. *Id.* at ¶ 12. "Furthermore, the Astoria and North Bend Coast Guard stations cannot provide adequate coverage when simultaneously responding to emergencies in their own primary service areas," with the result that Newport's fishing fleet would be practically deprived of helicopter coverage without a helicopter assigned to AIRFAC Newport. NFW Compl. ¶ 26.

In addition to the risk to the lives of the fishermen and other members of the Newport community, Plaintiffs assert that the removal of the rescue helicopter will also "cause substantial economic impact" including the loss of "millions of dollars due to preventable search and rescue costs, vessel losses, and human casualties." Cyr Decl. ¶ 15; *see also* Chuck Decl. ¶¶ 5-6 ("The commercial, aesthetic, recreational, scientific, environmental, educational, and even spiritual interests Lincoln County and/or its constituents will be adversely affected if the Coast Guard removes the

helicopter," as "the loss of Newport Air Base will place additional strain on the County's first responders," and the "resulting decreased safety along our coast will also no doubt impact commercial fishing, recreation, and tourism revenue that are vital to Lincoln County's economy.").

Plaintiffs seek a preliminary injunction to maintain the status quo ante regarding the deployment of a Coast Guard rescue helicopter to AIRFAC Newport.

## I.    Plaintiffs Seek a Prohibitory Injunction

The Government asserts that Plaintiffs are seeking a mandatory injunction, which is subject to a higher standard than a more conventional prohibitory injunction. *See Hernandez v. Sessions*, 872 F.3d 976, 999 (9th Cir. 2017) ("Mandatory injunctions, while subject to a higher standard than prohibitory injunctions, are permissible when extreme or very serious damage will result that is not capable of compensation in damages and the merits of the case are not doubtful." (internal quotation marks and citation omitted)).

The Government contends that Plaintiffs are seeking a mandatory injunction because, according to the Government, Plaintiffs are attempting to restore the status quo of 1987, including restoring the outdated HH-52 helicopters that were used in 1987. "The Coast Guard has no operational HH-52 helicopters so returning to the status quo 1987 is neither possible, nor desirable, and such a mandatory injunction should be denied." Def. Resp. at 28.

The Government's framing of the requested injunction is palpably ridiculous, and no Plaintiff has made any such request. Rather, the status quo sought by

Plaintiffs is the deployment of a rescue helicopter to AIRFAC Newport to provide search and rescue coverage, particularly during the dangerous Dungeness crab fishing season, as in previous years. The record in this case indicates that no helicopter was deployed at AIRFAC Newport from May 2025 until the issuance of the TRO and that this was a marked departure from the status quo in previous years. *See* Supp. Decl. Brickenstein Ex. B, at 9-10 (Captain Reinhold testifying that 2025 was the first time in the 38-year history of AIRFAC Newport that there was no 24/7 presence of a rescue helicopter during months other than June through September).

The distinction between a mandatory injunction and a prohibitory injunction "can fairly be categorized as one of action versus inaction," and "[t]he inquiry is whether the party seeking the injunction seeks to alter or maintain the status quo." *Fellowship of Chirstian Athletes v. San Jose Unified Sch. Dist. Bd. of Educ.*, 82 F.4th 664, 684 (9th Cir. 2023). The "status quo is the legally relevant relationship between the parties before the controversy arose." *Id.* (internal quotation marks and citation omitted). In *Fellowship of Christian Athletes*, the defendant made a change to a "longstanding relationship between the parties" and "[b]ecause it was the [defendant's] action that 'affirmatively changed the status quo and Plaintiff's motion for a preliminary injunction seeks to restore that status quo, the relief sought is properly viewed as a prohibitory injunction." *Id.* at 685; *see also Youth 71Five Ministries v. Williams*, No. 24-4101, ___F.4th___, 2025 WL 3438455, at *5 (9th Cir. Nov. 26, 2025) (holding same).

Here, as discussed, the longstanding status quo prior to the present controversy was that a Coast Guard rescue helicopter would be deployed to AIRFAC Newport. Defendants affirmatively altered that status quo by ceasing to deploy a rescue helicopter and Plaintiffs seek to restore the status quo. As in *Fellowship of Christian Athletes* and *Youth 71Five Ministries*, Plaintiffs seek a prohibitory injunction, rather than a mandatory injunction and the higher standards of a mandatory injunction do not apply.

## II.     Success on the Merits

To prevail on a motion for preliminary injunction, a plaintiff must show either a likelihood of eventual success on the merits or, under the Ninth Circuit's alternative "sliding scale" formulation of the test, serious questions going to the merits of their claims. *Winter*, 555 U.S. at 20; *Alliance for the Wild Rockies*, 632 F.3d at 1131-32. However, a court's decision on a motion for preliminary injunction is not a ruling on the merits of the claim. *Sierra On-Line, Inc. v. Phoenix Software, Inc.*, 739 F.2d 1415, 1422 (9th Cir. 1984).

Here, Plaintiffs allege that Defendants' effective closure of the Newport Air Facility violates 14 U.S.C. § 912 and the Administrative Procedures Act ("APA"), 5 U.S.C. § 706. NFW Compl. ¶¶ 29-49; State of Oregon Am. Compl. ¶¶ 111-16, ECF No. 58.[4]

---

[4] Although the Government suggests that Plaintiffs have brought their claims directly under 14 U.S.C. § 912 and argues that § 912 contains no private right of action, the plain language of the Complaints makes it clear that Plaintiffs have brought APA claims.

**A. 14 U.S.C. § 912**

Section 912 provides that the Secretary of Homeland Security "may not close a Coast Guard air facility, except as specified by this section." 14 U.S.C. § 912(a)(1).

The Secretary "may not propose closing or terminating operations at a Coast Guard air facility," unless she determines that (1) "remaining search and rescue capabilities maintain the safety of the maritime public in the area of the air facility;" (2) "regional or local prevailing weather and marine conditions, including water temperatures or unusual tide and current conditions, do not require continued operation of the air facility;" and (3) Coast Guard search and rescue standards related to search and response times are met. 14 U.S.C. § 912(a)(2).

In addition to making the necessary determinations, the Secretary must provide opportunities for public comment, "including the convening of public meetings in communities in the area of responsibility of the air facility with regard to the proposed closure or cessation of operations of the air facility," 14 U.S.C. § 912(a)(3)(A), and they must notify the congressional offices of the representatives of the area of responsibility for the air station of the schedule and location of such public meetings. 14 U.S.C. § 912(a)(3)(B).

Section 912 also contains strict requirements concerning notification to Congress:

> Prior to closure, cessation of operations, or any significant reduction in personnel and use of a Coast Guard air facility that is in operation on or after December 31, 2017, the Secretary shall—
>
>> (A) submit to the Congress a proposal for such closure, cessation, or reduction in operations along with the budget of the President

submitted to Congress under section 1105(a) of title 31 that includes--

> (i) a discussion of the determination made by the Secretary pursuant to paragraph (2); and
>
> (ii) a report summarizing the public comments received by the Secretary under paragraph (3)

(B) not later than 7 days after the date a proposal for an air facility is submitted pursuant to subparagraph (A), provide written notice of such proposal to each of the following:

> (i) Each member of the House of Representatives who represents a district in which the air facility is located.
>
> (ii) Each member of the Senate who represents a State in which the air facility is located.
>
> (iii) Each member of the House of Representatives who represents a district in which assets of the air facility conduct search and rescue operations.
>
> (iv) Each member of the Senate who represents a State in which assets of the air facility conduct search and rescue operations.
>
> (v) The Committee on Appropriations of the House of Representatives.
>
> (vi) The Committee on Transportation and Infrastructure of the House of Representatives.
>
> (vii) The Committee on Appropriations of the Senate.
>
> (viii) The Committee on Commerce, Science, and Transportation of the Senate.

14 U.S.C. § 912(a)(4).

Furthermore, the Secretary "may not close, cease operations, or significantly reduce personnel and use of a Coast Guard air facility for which a written notice is

provided under paragraph (4)(A) until a period of 18 months beginning on the date on which such notice is provided has elapsed."  14 U.S.C. § 912(a)(5).

As noted, the Government admits that it did not comply with the procedural requirements of § 912(a).

## B. Standing

The Government asserts that Plaintiffs lack standing to bring their claims.  To establish standing, plaintiffs must meet an "irreducible constitutional minimum" consisting of three elements: the plaintiff must have (1) suffered an injury in fact; (2) that is fairly traceable to the challenged conduct of the defendant; and (3) that is likely to be redressed by a favorable judicial decision.  *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (2016).  "The plaintiff, as the party invoking federal jurisdiction, bears the burden of establishing these elements."  *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016).  If at least one plaintiff has standing, the suit may proceed.  *Rumsfeld v. Forum for Academic and Institutional Rights, Inc.*¸547 U.S. 47, 52 n.2 (2006).  An organization, like the NFW, has standing to sue on behalf of its members if : (1) its members would otherwise have standing to sue in their own right; (2) the interests it seeks to protect are germane to the organization's purpose; and (3) neither the claim asserted, nor the relief requested, requires the participation of the individual members in the lawsuit.  *Hunt v. Wash. State Apple Adver. Comm'n*, 432 U.S. 333, 343 (1977).  "If an association can satisfy these requirements, [courts] allow the association to pursue its members' claims, without joining those members as parties to the suit."  *Coalition on Homelessness v. City and Cnty. of San Francisco*, 758 F.

Supp.3d 1102, 1122 (N.D. Cal. Dec. 4, 2024) (internal quotation marks and citation omitted).

To establish an injury in fact, the plaintiff "must show that he or she suffered an invasion of a legally protected interest that is concrete and particularized and actual or imminent, not conjectural or hypothetical." *Spokeo, Inc.*, 578 U.S. at 339 (internal quotation marks and citation omitted). For an injury to be "particularized" it "must affect the plaintiff in a personal and individual way," and a concrete injury "must be '*de facto*'; that is, it must actually exist." *Id.* at 339-40. (internal quotation marks and citations issued).

A "plaintiff threatened with future injury has standing to sue 'if the threated injury is 'certainly impending,' or there is a 'substantial risk that the harm will occur.'" *In re Zappos*, 888 F.3d 1020, 1024 (9th Cir. 2018) (quoting *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014)). Additionally, an "injury in fact sufficient confer standing" may be established by a "an act that increased [the plaintiff's] risk of future harm." *Krottner v. Starbucks Corp.*, 628 F.3d 1139, 1143 (9th Cir. 2010) (addressing a case in the plaintiffs sufficiently alleged an injury-in-fact when they alleged that a laptop containing their unencrypted personal data had been stolen); *see also Central Delta Water Agency v. United States*, 306 F.3d 938, 947-48 (9th Cir. 2002) ("The injury alleged has not yet occurred; it is threatened. Nevertheless, the possibility of future injury may be sufficient to confer standing on plaintiffs; threatened injury constitutes 'injury in fact.'").

Plaintiffs' allegations of harm in the present case do not require a speculative multi-link chain of inferences. The record establishes that the waters off the coast of Newport are dangerous and rescue response times are critical to the preservation of life in the event of a maritime disaster. Cyr. Decl. ¶¶ 4-5, 9, 14-15; Ainsworth Decl. ¶ 7. The Government's responses to Plaintiffs' discovery requests have revealed that, historically, the helicopter deployed to AIRFAC Newport engaged in a considerable volume of SAR launches and saved numerous lives on an annual basis, although this has declined sharply with the removal of the helicopter for much of 2025. Olson Decl. Ex. 1, at 7-9. The Coast Guard helicopter at AIRFAC Newport provides crucial protection to the people, and particularly to the mariners, of the area. Amicus Declarant Mayor Jan Kaplan expressed the situation succinctly: "The ocean can turn on a person in half a minute. It is not a matter of *if* the helicopter will be needed, but *when*, and whether or not it will arrive in time to save a life." Kaplan Decl. ¶13 (emphasis in original). In addition to the loss of life, the removal of the helicopter "will cause substantial economic impact including the loss of . . . millions of dollars due to preventable search and rescue costs, vessel losses, and human casualties." Cyr Decl. ¶ 15.

Here, the Government asserts that Plaintiffs have alleged only a "generalized interest in how Coast Guard search and rescue operations are conducted" and seek "to obtain relief on behalf of non-party hypothetical individuals" based on "anecdotal concerns about past conduct not before this Court." Def. Resp. at 11-12. This is not a case of a generalized grievance, however. At least some members of the NFW are

direct participants in the Newport fishing industry, *see e.g.*, Dixon Decl. ¶¶ 2-3 (Dixon is a member of the NFW Board of Directors and the owner of a fishing vessel based in Newport); Retherford Decl. ¶¶ 1-3, ECF No. 40 (Retherford is an NFW member and owner of three Newport-based commercial fishing vessels), while the organization itself works to advocate for the safety of the Newport fishing fleet. Bostwick-Terry Decl. ¶ 3; NFW Compl. ¶ 4 (NFW's mission is "voluntarily aiding and assisting families, relatives, or dependents of commercial fishermen or deceased commercial fishermen."). The State of Oregon, through ODFW and OSP, employs mariners who operate in the seas around Newport and rely on the AIRFAC Newport helicopter for their safety. Ainsworth Decl. ¶¶ 4-7; Thomas Decl. ¶¶ 3-5. Lincoln County, although not directly engaged in seafaring, has alleged that it will suffer harm in the form of increased danger to its residents and the commercial fishery that is central to the County's economic life, as well as increased strain on its own first response capabilities in the absence of the AIRFAC Newport rescue helicopter. Chuck Decl. ¶¶ 4-6; Shanks Decl. ¶ 12, ECF No. 41. "The fact that an injury may be suffered by a large number of people does not of itself make that injury a nonjusticiable generalized grievance." *Spokeo*, 578 U.S. at 339, n.7. These are concrete injuries particularized to the Plaintiffs in this case.

The Government also argues that the harms Plaintiffs complain of—capsizing, shipwrecks, and other maritime disasters—are not caused by the Coast Guard or traceable to the actions of the Coast Guard. Def. Resp. at 12. The Government further argues that the Coast Guard has no duty to assist vessels or persons in

distress.  *Id.* at 13.  This misapprehends the nature of Plaintiffs' claims, however. Plaintiffs do not allege that the Coast Guard is the cause of maritime disasters, but rather that the removal of the AIRFAC Newport rescue helicopter without following the proper procedures has eliminated a vital safety net that would protect them in the inevitable event of a maritime disaster.  NFW Reply at 6.

The Government contends that the SAR capabilities of AIRFAC Newport are redundant of those supplied by the Coast Guard Air Stations in Astoria and North Bend which are located, respectively, 95 nautical miles north and 70 miles south of AIRFAC Newport.  Reinhold Decl. ¶¶ 5, 22.  The Government asserts that the B-0 status rescue helicopter in AIRSTA North Bend has a response time equivalent to the B-1 status helicopter normally deployed to AIRFAC Newport because a helicopter launched from North Bend can reach the Newport area in approximately 35 minutes, which is very nearly the difference in the readiness times between a B-0 and a B-1 status helicopter.  Olson Decl. Ex. 3, at 23-24.  However, Captain Reinhold testified that the AIRFAC Newport B-1 status helicopter generally launched "close to the 30-minute window," while helicopters in B-0 status launch "close to 30 minutes all the time."  Brickenstein Decl. Ex. B, at 2; Olson Decl. Ex. 3, at 18.  The effect of this is that there "is essentially a negligible difference" between the two statuses.  Olson Decl. Ex. 3, at 13-14.  Captain Reinhold also acknowledged that winter weather conditions on the central Oregon coast might prevent the transit of a helicopter from AIRSTA North Bend to the Newport area entirely.  Brickenstein Decl. Ex. B, at 6. On this record and especially considering the evidence concerning the need for quick

action in cold water maritime crises, the Court cannot conclude that Plaintiffs are deprived of standing based on the alleged redundancy of AIRFAC Newport.

Finally, the Government has asserted that "[u]nder typical conditions found off the Oregon coast, even an individual in summer clothing would be functionally able to assist in their rescue within two hours of entering the water." Def. Resp. at 14; Forbes Decl. ¶¶ 8-9 (stating that a man immersed in turbulent 50° water wearing summer clothing would have the capacity to "participate in self-rescue" for 5.9 hours and a "predicted survival time" of 8.5 hours). However, as Captain Reinhold observed, "one cannot state with certainty the amount of time mariners can survive following a sinking off the Oregon coast, or anywhere else." Reinhold Decl. ¶ 20. Indeed, the Coast Guard's own publications on cold water survival indicate that death in water between 50° and 59° "can occur between 3 and 30 minutes after immersion," Supp. Brickenstein Decl. Ex. A, at 1, which is closer to the post-immersion survival timelines indicated by Dr. Cyr, Cyr Decl. ¶ 5, than those proposed by the Government through the Forbes Declaration. *See also* Supp. Cyr Decl. ¶ 4 ("Although I have not used the PSDA modeling program that [Defendants' Declarant] Dr. Forbes relies on, I can state with absolute certainty that 5.9 hours is vastly beyond the time within which any person wearing ordinary clothing would have any meaningful chance of surviving while immersed in turbulent 50 to 54-degree water off of Oregon's coast, let alone remain capable of assisting in their own rescue."). The Court finds the Government's argument on this point unpersuasive.

Plaintiffs also possess certain procedural rights under § 912, including the right to public comment with "the convening of public meetings in communities in the area of responsibility of the air facility with regard to the proposed closure or cessation of operations at the air facility," and to a delay of eighteen months between the provision of notice to Congress concerning the proposed closure, during which time the "Secretary may not close, cease operations, or significantly reduce personnel and use of a Coast Guard air facility." 14 U.S.C. §§ 912(a)(3), (5). "'The person who has been accorded a procedural right to protect his concrete interests can assert that right without meeting all the normal standards for redressability and immediacy,'" and a plaintiff "establishes 'procedural standing' by showing he was accorded a procedural right to protect his interests and that he has concrete interests that are threatened." *Sterling v. Feek*, 150 F.4th 1235, 1246 (9th Cir. 2025) (quoting *Lujan*, 504 U.S. at 572 n.7); *Robins*, 867 F.3d at 1113. "When a litigant is vested with a procedural right, that litigant has standing if there is some possibility that the requested relief will prompt the injury-causing party to reconsider the decision that allegedly harmed the litigant." *Massachusetts v. EPA*, 549 U.S. 497, 518 (2007).

Here, § 912 was enacted to protect the interests of Plaintiffs, among others. *See* Brickenstein Decl. Ex. A, at 3 (Congressman DeFazio speaking in support of the passage of H.R. 4188, stating that "this provision will ensure that any future proposal to close an AIRFAC will be vetted extensively through a transparent public process; a process that will ensure that the Coast Guard's search and rescue capabilities are the absolute last place one should consider cutting the Coast Guard's budget."). As

discussed above, Plaintiff's concrete interests are threatened and there is at least some possibility that, if the procedures of § 912(a) are followed, Defendants would reconsider their decisions regarding AIRFAC Newport.

In sum, the Court concludes that Plaintiffs have made a sufficient showing of an injury-in-fact, which is traceable to the actions of Defendants, and which can be redressed by a favorable judicial decision. For purposes of the present motion, the Court concludes that Plaintiffs have established standing.

## C. Final Agency Action

The Government asserts that there has been no final agency action sufficient to trigger the APA regarding AIRFAC Newport.

The APA provides for judicial review of a "final agency action for which there is no other adequate remedy in a court." 5 U.S.C. § 704. "For there to be 'final agency action,' 5 U.S.C. § 704, there must first be 'agency action.'" *San Francisco Herring Ass'n v. Dept. of the Interior*, 946 F.3d 564, 575 (9th Cir. 2019).

> The APA defines "agency action" as "the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act." 5 U.S.C. § 551(13). The statutory definition of an agency "rule" is broad and encompasses "the whole or a part of an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy or describing the organization, procedure, or practice requirements of an agency," 5 U.S.C. § 551(4). The definition of "rule" includes nearly every statement an agency may make.

*Prutehi Litekyan: Save Ritidian v. United States Department of Airforce*, 128 F.4th 1089, 1107 (9th Cir. 2025) (internal quotation marks and citations omitted, alterations normalized).

Here, the orders to cease deploying the rescue helicopter to AIRFAC Newport were clearly an "agency action."

For an agency action to be final, two conditions "must be satisfied." *Bennett v. Spear*, 520 U.S. 154, 177 (1997). "First, the action must mark the consummation of the agency's decisionmaking process—it must not be of a merely tentative or interlocutory nature." *Id.* at 177-78. "[S]econd, the action must be one by which rights or obligations have been determined, or from which legal consequences will flow." *Id.* at 178.

"In applying this test, [courts] look to factors such as whether the action amounts to a definitive statement of the agency's position, whether it has a direct and immediate effect on the day-to-day operations of the subject party, and if immediate compliance . . . is expected." *NLRB. v. Siren Retail Corp.*, 99 F.4th 1118, 1123 (9th Cir. 2024) (internal quotation marks and citations omitted). "'[Courts] also focus on the practical and legal effects of the agency action: The finality element must be interpreted in a pragmatic and flexible manner.'" *Prutehi Litekyan*, 128 F.4th at 1108 (quoting *Saliba v. U.S. Sec. & Exch. Comm'n*, 47 F.4th 961,967 (9th Cir. 2022)).

As evidence of a final agency action, Plaintiffs point to the series of memos concerning the deployment of the rescue helicopter to AIRFAC Newport. As previously outlined, the April 8 Memo proposed that the Coast Guard discontinue staffing AIRFAC Newport with a rescue helicopter between May and September, which was endorsed by Captain Conley in the May 22 Memo as a "temporary reduction in staffing," and subsequently approved by Admiral Fosse in the June 29

Memo, with the "expectation that [the Coast Guard] will resume standing the watch as soon as staffing allows, with a minimum goal of staffing Air Facility Newport as we have over the last several summer seasons." Olson Decl. Ex. 4, at 1-3. The core issue identified in the April 8 Memo, the May 22 Memo, and the June 29 Memo concerned staffing. However, when Scott Giard issued the October 29 Memo, he stated that those "staffing issues" had been "overcome," but that "mission critical deployments of aviation personnel preclude reconstitution of a B-1 readiness at Air Facility Newport," and that no helicopter would be deployed to AIRFAC Newport "until sufficient aviation personnel are available to safely meet the requirements." *Id.* at 4. Of note, the October 29 Memo does not include any date by which the helicopter would be restored to AIRFAC Newport. On November 23, 2025, a Coast Guard representative met with Oregon Senator Ron Wyden and representatives of NFW, Lincoln County, the City of Newport, the State of Oregon, and the Confederated Tribes of Siletz Indians and informed them that that the Coast Guard had "indefinitely" suspended deployment of a helicopter to AIRFAC Newport. McMahon Decl. ¶ 5. The Coast Guard representative was "unable to provide any information regarding when the helicopter would be returned to Newport." *Id.* at ¶ 6.

Captain Reinhold testified that the helicopter sent from AIRSTA North Bend to San Diego was expected to be returned to AIRSTA North Bend by mid-December. Olson Decl. Ex. 3, at 35-36. However, Defendants admit that "certain aviation ground support equipment" was removed from AIRFAC Newport, Olson Decl. Ex. 2, at 3, and

Captain Reinhold testified that signs identifying AIRFAC Newport as a Coast Guard facility were removed between October and November 2025 because the Coast Guard had "no current rotational presence there," and "the facility wasn't being used overnight like it had been in the past." Supp. Brickenstein Decl. Ex. B, at 11-12.

On this record and for the purposes of this motion, the Court concludes that, at the very least, the October 29 Memo, which extended the suspension of helicopter deployments indefinitely, was the "final word" on helicopter deployments to AIRFAC Newport and that it was a decision from which legal consequences flowed and which had a direct day-to-day effect on Plaintiffs. The Court concludes that Plaintiffs have sufficiently demonstrated that they seek to challenge a final agency action, rather than a tentative or interlocutory decision.

### D. APA Claims

Under the APA, courts are empowered to "hold unlawful and set aside agency action, findings, and conclusions found to be" (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; (B) contrary to constitutional right, power, privilege, or immunity; (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; (D) without observance of procedure required by law; (E) "unsupported by substantial evidence" in certain cases; or (F) unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court. 5 U.S.C. § 706(2).

The State of Oregon alleges that "Defendants' action is not in accordance with the law and is without observance of the procedures required by law" and that

"Defendants' reassignment of the rescue helicopter from AIRFAC Newport represents closure, cessation of operations, or significant reduction in the personnel and use of AIRFAC Newport without satisfying the requirements of 14 U.S.C. § 912," for purposes of U.S.C. § 706(2)(A), (C) and (D). State of Oregon Am. Compl. ¶ 114. The State of Oregon further alleges that, "in addition to being contrary to law, Defendants' closure, cessation of operations, or significant reduction in the personnel and use of AIRFAC Newport is arbitrary and capricious because Defendants have not offered a satisfactory explanation for their action, including a rational connection between the facts found and the choice made." State of Oregon Am. Compl. ¶ 116 (internal quotation marks and citation omitted, alteration normalized). Similarly, NFW and Lincoln County allege that Defendants actions were "not in accordance with law, without observation of the procedures required by law, and arbitrary and capricious within the meaning of the Administrative Procedure Act," citing 5 U.S.C. §§ 706(2)(A), (C), and (D). NFW Compl. ¶ 37.

The requirements of § 912(a) are outlined above but the statute first requires that the Secretary make certain determinations before she can propose closing or terminating operations at a Coast Guard air facility, § 912(a)(2); that a public comment period be provided, including the convening of public meetings in the relevant communities, § 912(a)(3); the provision of notice to Congress, § 912(a)(4); and an eighteen-month waiting period following notice to Congress during which the Secretary "may not close, cease operations, or significantly reduce personnel and use of a Coast Guard air facility," § 912(a)(5). The Government admits that 14 U.S.C. §

912 is a duly enacted and binding law and further admits that Defendants did not comply with any of the requirements of § 912(a).  Olson Decl. Ex. 2, at 4-7.

The Government first argues that it has not triggered the requirements of § 912(a) because it has not closed AIRFAC Newport.  The Government points out that the rescue helicopter was always "stationed" at AIRSTA North Bend and was only forward deployed to AIRFAC Newport and that the Station Keeper was the only person permanently stationed at AIRFAC Newport.  The Government also notes that helicopters from AIRSTA North Bend would still occasionally land at AIRFAC Newport as part of training exercises.

The Court is not convinced.  The record indicates, as previously discussed, that beginning in May 2025, there was no helicopter deployed to AIRFAC Newport until the Court issued its TRO.  This was a marked departure from previous years in which a helicopter has been, at the very least, deployed to AIRFAC Newport on the weekends between June and September and full time from October to May.  "Certain aviation ground support equipment" was removed from AIRFAC Newport, Olson Decl. Ex. 2, at 3, and signs designating AIRFAC Newport as a Coast Guard air facility were removed in October and November 2025, because the Coast Guard "had no current rotational presence there" and "the facility wasn't being used overnight like it had in the past."  Supp. Brickenstein Decl. Ex. B, at 11-22.  The October 29 Memo and the statements of the Coast Guard representative during the November 23, 2025, meeting with Plaintiffs and Senator Wyden indicate that the absence of the rescue helicopter from AIRFAC Newport was of indefinite duration.   On this record,

Plaintiffs have made a significant showing that the Defendants actions amounted to the closure or cessation of operations at AIRFAC Newport. The Congressional notice requirement and the eighteen month waiting period of 14 U.S.C. §§ 912(a)(4) and (5) apply to actions that involve a "significant reduction in personnel and use of a Coast Guard air facility," and, despite the Government's arguments to the contrary, the complete absence of the helicopter from AIRFAC Newport between May 2025 and the entry of the TRO is certainly a "significant reduction in the personnel and use" of AIRFAC Newport.

The Government asserts that its actions were permissible under § 912(b), which provides that "[t]he Secretary may implement any reasonable management efficiencies within the air station and air facility network, such as modifying the operation posture of units or reallocating resources necessary to ensure the safety of the maritime public nationwide." 14 U.S.C. § 912(b). The Government argues that the decision to cease deploying a rescue helicopter to AIRFAC Newport was just such a modification of the operation posture of units and/or allocation of resources.

However, as noted, the various procedural requirements of § 912(a) are triggered by the closure of, the cessation of operations in, or a significant reduction in the personnel and use of a Coast Guard air facility. If the Court were to accept the Government's arguments that the indefinite reassignment of AIRFAC Newport's primary resource—the rescue helicopter—along with associated ground equipment and signage, was merely a reallocation of resources, then § 912(b) would swallow § 912(a) and allow the Government to maintain air facilities that exist only on paper,

which would be contrary to the clear purpose of § 912 as a whole. As the Court found in issuing the TRO, the Secretary remains free to implement "reasonable management efficiencies within the air station and air facility network," under § 912(b) so long as they do not amount to closing, ceasing operations, or significantly reducing the personnel and use of a Coast Guard air facility, as those actions trigger the procedural protections of § 912(a).

On this record, the Court concludes, based on Defendants' admitted failure to comply with the procedural requirements of § 912(a), that Plaintiffs have demonstrated a likelihood of success on the merits, or at the very least serious questions going to the merits, of their APA claims. This factor therefore weighs in favor of the requested injunction.[5]

### III.    Irreparable Harm

A plaintiff seeking an injunction must "must establish that irreparable harm is *likely*, not just possible." *Alliance for the Wild Rockies*, 632 F.3d at 1131 (emphasis in original). Here, Plaintiffs have presented compelling evidence of a grave risk to the lives of the Newport fishermen in the coming Dungeness crab fishing season, as well as risks to State of Oregon employees who rely on AIRFAC Newport for helicopter rescue.

The Government argues that the status quo was to maintain a B-1 status helicopter at AIRFAC Newport outside of the months between June and September when it maintained a helicopter at AIRFAC Newport on holidays and weekends and

---

[5] The Court need not reach the State of Oregon's alternative arguments concerning the Coastal Zone Management Act to grant the requested relief.

that it "intends to maintain this operational posture upon the expiration of the TRO so no further injunctive relief is required." Def. Resp. at 29. The record in this case, however, is that the helicopter was removed beginning in May 2025, and, in October 2025, its removal was made indefinite. The helicopter was only returned when the Court issued its TRO. There is no indication that the October 29 Memo has been rescinded or superseded. The Court concludes that Plaintiff have established a likelihood of irreparable harm and this factor weighs in favor of the requested injunction.

## IV.     Balance of the Equities and the Public Interest

Under the "balance of equities" analysis, a court must "balance the competing claims of injury" and "consider the effect on each party of the granting or withholding of the requested relief." *Winter*, 555 U.S. at 24 (internal quotation marks and citation omitted). The public interest inquiry, by contrast, "primarily addresses impact on non-parties rather than parties." *League of Wilderness Defs./Blue Mountains Biodiversity Project v. Connaughton*, 752 F.3d 755, 766 (9th Cir. 2014). When, as here, the government is a party to the action, these factors will merge. *Drakes Bay Oyster Co. v. Jewell*, 747 F.3d 1073, 1092 (9th Cir. 2014).

Here, Plaintiffs have made a compelling showing that public safety, and by extension the public interest, are deeply intertwined with the continued operation of AIRFAC Newport, particularly as the fishermen embark on the most dangerous season of the year. AIRFAC Newport was constructed in response to a maritime tragedy and Plaintiffs have presented evidence that, without its continued operation,

the Newport fishermen, the State of Oregon employees, and the community at large will face serious danger due to the lack of rescue helicopter coverage.

The status quo in this case, which was restored by the Court's TRO, is that a Coast Guard MH-65 Echo rescue helicopter was deployed full time to AIRFAC Newport, together with full operational capabilities, infrastructure, and personnel support.[6]

The Government acknowledges that it is not harmed by an injunction requiring it to obey the law. Def. Resp. at 29. Nevertheless, the Government argues that the balance of equities and the public interest do not favor an injunction because the Coast Guard must balance its available helicopter assets against its needs. The Court appreciates the difficulty, but it is Congress, not this Court, that imposed strict procedural requirements on actions that close, cease operations, or significantly reduce the personnel or use of a Coast Guard air facility. The requested injunction serves only to restore the status quo in light of the Government's admitted failure to follow the procedures outlined in § 912(a).

The Court concludes that the balance of the equities and the public interest weigh sharply in favor of the requested injunction.

## V.    Bond

The Court "may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper

---

[6] Plaintiffs make no request concerning the readiness status of the helicopter at AIRFAC Newport and the decision whether the helicopter should be in B-0 or B-1 status is precisely the sort of operational decision encompassed by § 912(b). Accordingly, the Court will not require any specific readiness status as part of the injunction in this case.

to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c). Here, the Court concludes that the facts of this case do not support the necessity of a bond and so no bond shall be required.

## CONCLUSION

For the reasons set forth above, the Court GRANTS the Motions for Preliminary Injunction filed by Plaintiffs. ECF Nos. 39, 42.

Defendants United States Coast Guard and the United States Department of Homeland Security acting by and through Secretary Kristi Noem are hereby ORDERED to preserve the status quo ante by restoring and maintaining the deployment of a Coast Guard MH-65 rescue helicopter to AIRFAC Newport, together with full operational capabilities, infrastructure, and personnel support during the pendency of these consolidated cases.

It is so ORDERED and DATED this ____22nd____ day of December 2025.


          /s/Ann Aiken_____
          ANN AIKEN
          United States District Judge